IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MARITZA OTERO VAZQUEZ,

    Plaintiff,

    v.                                    CIVIL NO. 01-2126 (RLA)

AMERICAN HOME PRODUCTS CORP.,
et al.,

    Defendants.

## ORDER IN THE MATTER OF MOTIONS FOR SUMMARY JUDGMENT FILED BY WYETH-PR AND THE INDIVIDUAL DEFENDANTS

Defendant WYETH-PR as well as LUIS FERRER, MIGUEL LOPEZ and GERARDO CURET, the individually named defendants in this action, have filed their respective motions for summary judgment seeking dismissal of the sexual harassment and retaliation claims asserted by plaintiff under Title VII as well as the supplemental causes of action.

### SUMMARY JUDGMENT STANDARD

Rule 56(c) Fed. R. Civ. P., which sets forth the standard for ruling on summary judgment motions, in pertinent part provides that they shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Sands v. Ridefilm Corp., 212 F.3d 657, 660-61 (1st Cir. 2000); Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record.

CIVIL NO. 01-2126 (RLA)                                              **Page 2**

DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997).  A genuine issue exists if there is sufficient evidence supporting the claimed factual disputes to require a trial.  Morris v. Gov't Dev. Bank of Puerto Rico, 27 F.3d 746, 748 (1st Cir. 1994); LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994).  A fact is material if it might affect the outcome of a lawsuit under the governing law. Morrissey v. Boston Five Cents Sav. Bank, 54 F. 3d 27, 31 (1st Cir. 1995).

"In ruling on a motion for summary judgment, the court must view 'the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.'" Poulis-Minott v. Smith, 388 F.3d 354, 361 (1st Cir. 2004) (citing Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir.1995)).

Credibility issues fall outside the scope of summary judgment. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). *See also*, Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000) ("court should not engage in credibility assessments."); Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 49 (1st Cir. 1999) ("credibility determinations

CIVIL NO. 01-2126 (RLA)                                        **Page 3**

are for the factfinder at trial, not for the court at summary judgment."); Perez-Trujillo v. Volvo Car Corp., 137 F.3d 50, 54 (1st Cir. 1998) (credibility issues not proper on summary judgment); Molina Quintero v. Caribe G.E. Power Breakers, Inc., 234 F.Supp.2d 108, 113 (D.P.R. 2002). "There is no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, and no room for the judge to superimpose his own ideas of probability and likelihood. In fact, only if the record, viewed in this manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment.". Cruz-Baez v. Negron-Irizarry, 360 F.Supp.2d 326, 332 (D.P.R. 2005) (internal citations, brackets and quotation marks omitted).

In cases where the non-movant party bears the ultimate burden of proof, he must present definite and competent evidence to rebut a motion for summary judgment, Anderson v. Liberty Lobby, Inc., 477 U.S. at 256-257, 106 S.Ct. 2505, 91 L.Ed.2d 202; Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2000); Grant's Dairy v. Comm'r of Maine Dep't of Agric., 232 F.3d 8, 14 (1st Cir. 2000), and cannot rely upon "conclusory allegations, improbable inferences, and unsupported speculation". Lopez-Carrasquillo v. Rubianes, 230 F.3d 409, 412 (1st Cir. 2000); Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994); Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

CIVIL NO. 01-2126 (RLA)                                                Page 4

## LOCAL RULE 56(C)

WYETH-PR attacks plaintiff's proffered facts both on procedural and substantive grounds. Initially defendant contends that plaintiff failed to abide by the strictures of Local Rule 56(c) in responding to movant's Proposed Statement of Uncontested Facts and that her response "is plagued with speculation, argumentation, conclusory assertions and references to immaterial testimony and documents which do not controvert defendant's Statement." WYETH-PR's Reply (docket No. 132) p. 2. Defendant further notes plaintiff's initial failure to submit the exhibits via electronic filing and failure to include an index.[1]

In pertinent part, Local Rule 56(c) reads:

A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts.  The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule.

This provision specifically requires that in its own statement of material facts respondent either admit, deny, or qualify each of

---

[1]  Plaintiff subsequently complied. *See*, Plaintiff's Motion Submitting Exhibit (docket No. 140).

movant's proffered uncontested facts and for each denied or qualified statement cite the specific part of the record which supports its denial or qualification. Respondent must prepare its separate statement much in the same manner as when answering a complaint.

The purpose behind the rule is to allow the court to examine each of the movant's proposed uncontested facts and ascertain whether or not there is adequate evidence to render it uncontested. *See*, Morales v. A.C. Orssleff's EFTF, 246 F.3d 32, 33 (1st Cir. 2001) (summary judgment should not "impose [upon the court] the daunting burden of seeking a needle in a haystack"); *see also*, Leon v. Sanchez-Bermudez, 332 F. Supp.2d 407, 415 (D.P.R. 2004).

Apart from the fact that Local Rule 56(e) itself provides that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted" in discussing Local Rule 311.12, its predecessor, the First Circuit Court of Appeals stressed the importance of compliance by stating that the parties who ignore its strictures run the risk of the court deeming the facts presented in the movant's statement of fact admitted. *See*, Cosme-Rosado v. Serrano-Rodríguez, 360 F.3d 42 (1st Cir. 2004) ("uncontested" facts pleaded by movant deemed admitted due to respondent's failure to properly submit statement of contested facts). "[A]bsent such rules, summary judgment practice could too easily become a game of cat-and-mouse, giving rise to the 'specter of

district court judges being unfairly sandbagged by unadvertised factual issues.'" Ruiz Rivera v. Riley, 209 F.3d 24, 28 (1st Cir. 2000) (citing Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 931 (1st Cir. 1983)).

Further, Local Rule 56(c) provides that "the opposing statement may contain in a separate section additional facts, set forth in separate numbered paragraphs and supported by a record citation as required by subsection (e) of this rule."

Upon review of plaintiff's statement we find that it does not fully comply with the clear terms of the rule in that it contains no "separate, short, and concise statement of material facts" or admissions, denials or qualifications with direct reference to each numbered paragraph of defendant's proposed uncontested facts following WYETH-PR's numerical sequence. Instead, in response to WYETH-PR's 11 pages of neatly listed facts adequately referenced to the specific evidence used in support thereof plaintiff submitted 54 pages of proposed facts which are intermingled with countless argumentations and conclusory statements.

Plaintiff's failure to strictly adhere to the rule's mandate, particularly due to the argumentative approach utilized throughout the document, has made the court's task of ascertaining which specific facts are in controversy a difficult one. Even though plaintiff addressed most of the relevant facts it was not done in an orderly fashion placing the onus on the court to go through the

CIVIL NO. 01-2126 (RLA)                                              Page 7

entire record to determine which ones were contested or which additional facts were being proposed. However, given plaintiff's partial compliance with the rule and particularly due to the nature of this litigation the court finds that striking her proposed facts is too harsh a sanction.

Accordingly, WYETH-PR's request to strike plaintiff's statement of facts is **DENIED**.

**THE FACTS**

The following facts are uncontested.

1.   Plaintiff commenced working as a medical representative with the WYETH-PR Sales Division in **1991**.

2.   Plaintiff's responsibilities as a medical representative required that she sell and promote WYETH pharmaceutical products in accordance with Company policies to achieve maximum market share within her assigned territory.

3.   As a medical representative, plaintiff is compensated on a salary basis and also receives commissions for prescription sales. The amount earned in commissions depends on the market share achieved by the products in her portfolio within her assigned territory. Market share is measured in terms of prescription percent growth in a given territory. Percent growth, in turn, depends on the effort of the team of medical representatives working the territory and sharing the same products.

CIVIL NO. 01-2126 (RLA)                                    Page 8

4.   In performing her responsibilities as a medical representative, most of plaintiff's time was spent out in the field, visiting doctors in her territory. Ordinarily, plaintiff was not required to report to WYETH-PR offices with any specific frequency, so long as she attended scheduled meetings and turned in her reports on time.

5.   At all relevant times WYETH-PR's medical representatives were divided into districts, which were supervised by a District Manager. The districts, in turn, were divided into territories which had medical representatives assigned to specific product portfolios, i.e., a particular set of pharmaceutical products, to promote within that territory.

6.   LUIS FERRER began supervising plaintiff in **1995** when he was named District Manager for District I.

7.   Up until late **1998** FERRER and plaintiff had a good working relationship.

8.   In 1999 MIGUEL LOPEZ was appointed Sales Manager of Puerto Rico and as such became FERRER's supervisor.

9.   GERARDO CURET is the Director of Marketing and Sales for WYETH-PR.

10.  At all relevant times WYETH-PR had a sexual harassment policy in effect which was regularly circulated among its employees. Plaintiff was aware of this policy.

CIVIL NO. 01-2126 (RLA)                                          **Page 9**

11.  WYETH-PR regularly provides its supervisory and management personnel with training meant to prevent sexual harassment in the workplace.

12.  WYETH-PR's sexual harassment policy required that employees immediately report sexual harassment to their supervisors or the Human Resources Department.

13.  PILAR SASTRE, Human Resources Director, was the person responsible for investigating allegations of sexual harassment.

14.  In performing her duties as a medical representative, plaintiff would have contact with FERRER once or twice a month during supervisory visits to the field.

15.  During the supervisory visits, District Managers would accompany the medical representatives during their promotional visits to the different physicians, observe the presentation and comment on the performance. After completing the visit, the District Manager and the medical representative would go to a restaurant, or other place with tables available, to discuss the day's work and the evaluation.

16.  On **September 27, 1999** plaintiff visited WYETH-PR's Human Resources office and met with SASTRE in order to complain of several incidents she claimed constituted harassment by FERRER.

17. LOPEZ joined the meeting and spoke with plaintiff regarding her concerns pertaining to FERRER.

18. Subsequently SASTRE and LOPEZ met with FERRER regarding plaintiff's allegations.

19. Pursuant to the meetings SASTRE concluded plaintiff's allegations did not rise to the level of sexual harassment.

20. LOPEZ concluded that plaintiff's complaints were due to clashing personalities unrelated to sexual harassment.

21. In early **October 1999** LOPEZ met with FERRER and plaintiff in order to discuss plaintiff's allegations.

22. On or about **January 28, 2000** plaintiff was changed from product portfolio PHC-3 to PHC-2.

23. On or about **September 14, 2000** plaintiff met with SASTRE and delivered a letter dated September 11, 2000 outlining specific complaints against FERRER.

24. The September 11, 2000 letter was plaintiff's first written complaint of harassment.

25. The September 11, 2000 letter included complaints plaintiff had raised in 1999 plus additional events which purportedly took place in 2000.

26. Upon receiving this letter SASTRE met with HECTOR CABRERA, Vice-President and General Manager of WYETH Sales Office in Puerto Rico and CURET and the three of them decided it was

best to immediately change plaintiff's reporting relationship.

27.  Plaintiff met with SASTRE, CURET and CABRERA on or about **September 19, 2000** to discuss her allegations against FERRER.

28.  The Company again concluded that plaintiff's allegations did not rise to the level of sexual harassment.

29.  Notwithstanding, as a temporary alternative, the Company agreed to change plaintiff's reporting supervisor to LUIS RIVERA from District II while remaining in Ferrer's district, District I.

30.  Plaintiff was informed of this change by CURET on or about **September 21, 2000** and of the fact that it would be effective until **December 31, 2000.**

31.  Plaintiff was satisfied with this change and thereafter there were no additional incidents of sexual harassment.

32.  On **January 8, 2001** plaintiff was transferred to the district supervised by LUIS RIVERA, i.e., District II and assigned the PHC-3 product portfolio.

33.  Plaintiff filed EEOC charges of sexual harassment before the Puerto Rico Labor Department Anti-Discrimination Unit on **September 14, 2000, November 16, 2000, February 5, 2001** and **March 1, 2001.**

CIVIL NO. 01-2126 (RLA)                                              **Page 12**

---

### PLAINTIFF'S CLAIMS

Initially plaintiff claims that she was subjected to a hostile work environment generated by her supervisor, that is, FERRER's sexual harassment commencing late 1998 when she divorced her husband and that despite having made this situation known to management in September 1999 nothing was done to correct it.

Additionally plaintiff alleges that she was subjected to a series of adverse employment actions in retaliation for having voiced her opposition to FERRER's conduct.

### HOSTILE WORK ENVIRONMENT

The protection against discrimination in employment based on sex provided by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) has been expanded to areas beyond strictly "economic" and "tangible discrimination" to situations where "sexual harassment is so severe or pervasive as to alter the condition of the victim's employment and create an abusive working environment." Faragher v. City of Boca Raton, 524 U.S. 775, 786, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662, 675 (1998) (citations, internal quotation marks and brackets omitted); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295, 302 (1993); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 2404-05, 91 L.Ed.2d 49, 60 (1986); Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005).

CIVIL NO. 01-2126 (RLA)                                              **Page 13**

Ascertaining which particular conduct falls within the "severe or pervasive" realm in order to trigger Title VII protection is no easy task.  However, "in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787, 118 S.Ct. at 2283, 141 L.Ed.2d at 676; Noviello, 398 F.3d at 92. The court will examine the totality of the circumstances to determine whether the degree of the hostile or abusive environment the employee is subjected to is intense enough to fit within Title VII protection. Faragher, 524 U.S. at 787, 118 S.Ct. at 2283, 141 L.Ed.2d at 676; Noviello, 398 F.3d at 92; Lee-Crespo v. Schering-Plough del Caribe, Inc., 354 F.3d 34, 46 (1st Cir. 2003); Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 40 (1st Cir. 2003).

> [W]hether the environment is objectively hostile or abusive must be answered by reference to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.

Marrero v. Goya de P.R., Inc., 304 F.3d 7, 18-19 (1st Cir. 2002) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)) (internal citations omitted); Noviello,

CIVIL NO. 01-2126 (RLA)                                    **Page 14**

398 F.3d at 92; Lee-Crespo, 354 F.3d at 46; Che, 342 F.3d at 40;

Gorski v. New Hampshire Dep't of Corrections, 290 F.3d 466, 472 (1st

Cir. 2002); Conto v. Concord Hosp., Inc., 265 F.3d 79, 82 (1st Cir.

2001); O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir.

2001).

The First Circuit Court of Appeals summarized the elements

plaintiff must prove in order to succeed in her hostile work

environment claim as set forth by the Supreme Court.  These are:

> (1) that she... is a member of a protected class; (2) that
> she was  subjected to unwelcome sexual harassment; (3) that
> the harassment was based upon sex; (4) that the harassment
> was sufficiently severe or pervasive so as to alter the
> conditions of plaintiff's employment and create an abusive
> work environment; (5) that sexually objectionable conduct
> was both objectively and subjectively offensive, such that
> a reasonable person would find it hostile or abusive and
> the victim in fact did perceive it to be so; and (6) that
> some basis for employer liability has been established.

O'Rourke, 235 F.3d at 728.

A hostile work environment may result from "sexual remarks,

innuendoes, ridicule and intimidation ... disgusting comments" Goya,

304 F.3d at 19 (citations and internal quotations omitted) "unwelcome

sexual advances or demands for sexual favors" Gorski, 290 F.3d at 472

(citations and internal quotations omitted) which are "sufficiently

severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." O'Rourke, 235 F.3d at 728 (citations and quotation marks omitted). *See also*, Noviello, 398 F.3d at 84.

Courts must discern between "commonplace indignities typical of the workplace (such as tepid jokes, teasing, or aloofness... and severe or pervasive harassment... [and] [t]he thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." *Id* at 92. *See also*, Lee-Crespo, 354 F.3d at 37 (supervisor's conduct found "boorish and unprofessional" and plaintiff "subjected to incivility" "but... incidents... not severe or pervasive enough to alter the terms and conditions of [plaintiff's] employment").

It is plaintiff's burden to establish the severity and pervasiveness of the harassment sufficient to alter the conditions of her employment. Conto, 265 F.3d at 82. In this particular case plaintiff must also present evidence that the harassment was based on plaintiff's gender. Lee-Crespo, 354 F.3d at 44 n.6.

Because this determination is "fact specific" Conto, 265 F.3d at at 81, ordinarily "it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." Goya, 304 F.3d at 19. *See also*, Che, 342 F.3d at

CIVIL NO. 01-2126 (RLA)                                        Page 16

40 ("[a]s a general matter, these are questions best left for the jury.")

### A. Evidence of Sexual Incidents and Offensive Remarks

Plaintiff maintains that even though FERRER began supervising her in 1995 his inappropriate remarks and conduct started upon her divorce in late 1998. Up to that time there had been no sexual advances.

According to plaintiff's testimony during her deposition[2] she was subjected to numerous sexual incidents and offensive remarks by FERRER such as FERRER asking her whether she went to bed with HECTOR CABRERA, WYETH-PR's Vice-President and General Manager.[3] Plaintiff also testified that FERRER intentionally rubbed his arms against her breasts at a business activity at the Cerromar Hotel in January 1999.[4] According to plaintiff, when dinner was over FERRER "put his hands in my plate... rubbing his arm against my breast, telling me and indicating, in a bad way, that that was no way to put the cutlery...

_____

[2]  According to WYETH's Exhibit Index attached to its Statement of Uncontested Facts (docket No. 126) plaintiff's deposition was taken over a period of four days, i.e., September 17 and 18, 2002, November 22, 2002 and December 2, 2002. However, the page numbers for the four deposition transcripts are not in sequence and are therefore, repetitive. Because not all deposition transcript sessions were duly identified by plaintiff we have not been able to specify the particular deposition session in virtually all our references to plaintiff's testimony.

[3]  Plaintiff's depo. pp. 96-97.

[4]  Plaintiff's depo. pp. 117-18.

but all along he was putting his arm on my breast".[5] Additionally, plaintiff complained that FERRER would comment on her legs. "He used to tell me, 'What lovely legs, What pretty legs', that the doctors couldn't attend to me because they were paying attention to my legs."[6]

In describing what she perceived was FERRER's inappropriate and sexually charged conduct plaintiff further noted:

Mr. Ferrer, with a brazen look, he was always looking at my legs, Mr. Ferrer would brush his arm up against my chest, Mr. Ferrer told me that he could see the thread of a tampon on a woman.

He would sit down and tell me that his wick was short. That the doctors couldn't pay attention to me because they were only looking at my legs. When I cut my hair, "You looks (sic) so lovely," but going beyond the way that you might look at me or the way she might look at me or he might look at me.

When I put green eyes on, "You look so lovely with green eyes. It changes your skin. It changes your hair. It changes everything."

He had a thing with my hands, he had a thing with my nails. If I was wearing my Cartier watch, he had to touch my hand to see my Cartier.

---

[5]  Plaintiff's depo. p. 99.

[6]  Plaintiff's depo. p. 102.

CIVIL NO. 01-2126 (RLA)                                              **Page 18**

---

Plaintiff's depo. pp. 144-45.

Plaintiff further noted that FERRER looked at her in a lascivious manner.[7]

Additionally, once or twice a month when they were in the field together while plaintiff was using the computer FERRER would ask to see something in her computer and would "brush[] up against" her.[8]

Plaintiff further noted that FERRER persecuted her, that his insinuations were "constant" and that he would even call her during her vacations.[9] Plaintiff testified that she was concerned because FERRER followed her and "was bent on knowing whether I went to the gynecologist and all of that nature of things he was bent on knowing about those things about [her]."[10] According to plaintiff FERRER further persecuted her by asking co-workers regarding her personal life and her clothes. For instance, he asked TOMAS MARTINEZ if plaintiff was his lover. Plaintiff testified, "he would ask my coworkers about me. How would my coworkers know about me and about my activities this man is calling me. He's asking about me."[11]

---

[7]  Plaintiff's depo. p. 144-45.

[8]  Plaintiff's depo. p. 179.

[9]  Plaintiff's depo. p. 104.

[10]  Plantiff's depo. p. 135.

[11]  Plaintiff's depo. p. 135. Defendant objects to the admissibility of this testimony. Facts proffered in support or in opposition to summary judgment request must be admissible at trial. Hence, only incidents within the proponent's personal knowledge will be allowed whereas inadmissible hearsay will not be considered by the

According to plaintiff the harassment continued after the September 1999 meeting.  At an August 13, 2000 WYETH-PR activity at the Cerromar Hotel plaintiff claims that FERRER "came close to me like this and put his lips, pressing all his body, you can imagine, 'Yo (sic) can leave now so that tomorrow you go for your Altase modules', touching me."[12]

Plaintiff alleges that after she went swimming at a sales and strategy meeting in St. Thomas in July 2000 "Mr. Ferrer approached me and he told me, 'You swim so well,' looking at me from top to bottom."[13]

Additionally, as evidence of FERRER's harassment plaintiff notes that during a sales training session in Tennessee[14] held in November 2000 FERRER sat right behind her.[15]

---

court. <u>Noviello</u>, 398 F.3d at 84.

[12]   Plaintiff's depo. p. 227.

[13]   Plaintiff's depo. p. 124.

[14]   Plaintiff complains that FERRER was assigned a seat behind her in the flight to Tennessee. However, there is no admissible evidence to ascribe improper motives to the seat arrangement. Plaintiff merely speculates "that travel seats are normally assigned by the airline pursuant to the traveler's accommodating request." docket No. 129 p. 38

[15]   Plaintiff also cites the fact that she was assigned to attend a workshop at El Conquistador Hotel in Fajardo directed by FERRER in support of her claim. However, it is undisputed that FERRER was selected by LOPEZ due to his expertise on the particular products being discussed and that his role was limited to that of a moderator. Thus, we find this particular evidence not probative of any improper animus.

CIVIL NO. 01-2126 (RLA)                                          Page 20

---

## B. Plaintiff's Complaints to WYETH-PR

WYETH-PR contends that plaintiff should be precluded from asserting that she discussed incidents purportedly constituting sexual harassment at the September 1999 meetings with PILAR SASTRE and LOPEZ not listed at defendant's Proposed Uncontested Fact No. 25. Additionally, defendant argues that in her declaration plaintiff recanted prior testimony regarding the scope of her disclosures at the aforementioned meeting.[16] However, we do not read plaintiff's answers at pages 93-94 of her deposition as clearly and straightforward as defendant does, particularly given the context in which the responses were given. An examination of the attorneys' exchanges as well as plaintiff's responses at the time commencing at page 89 of her deposition are confusing to say the least.[17]

A review of WYETH-PR's Proposed Uncontested Fact No. 25 reveals that defendant relies essentially on the deposition testimony of SASTRE and LOPEZ for its position that plaintiff did not specifically mention sexual harassment conduct at their meeting. However, this position is contradicted by plaintiff's deposition testimony where

---

[16]  It should be noted that just because a statement submitted in response to a summary judgment request is "self-serving" it does not automatically renders it inadmissible provided it is based on personal knowledge. Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000).

[17]  Apparently plaintiff's emotional condition hampered her ability to fully comprehend the questions being posed and to provide precise and complete answers. This is evident from the obvious difficulty encountered by defendants' counsel in examining plaintiff during the course of her deposition.

**CIVIL NO. 01-2126 (RLA)**                                              **Page 21**

she listed additional instances of harassment and where she specifically indicated having reported these incidents initially to PILAR SASTRE and subsequently to MIGUEL LOPEZ at the September 1999 meeting. P's depo. p. 105.

The same holds true regarding the frequency of plaintiff's contact with FERRER where defendant cites pages 103-04 of her deposition for the proposition that FERRER's supervisory visits took place "once or twice a month." However, at Part II page 108 of her same deposition plaintiff testified that she would see FERRER "quite frequently" about "[o]nce or twice a week [] [m]aybe three, if there was a meeting."

Thus, defendant's request to disregard plaintiff's opposition to its Proposed Uncontested Fact No. 25 is **DENIED.**

Additionally, WYETH-PR downplays the incidents alleged by plaintiff claiming they are not described with sufficient specificity, not sex-based and not sufficiently severe or frequent to constitute the type of abusive conduct proscribed by Title VII.

However, upon review of the totality of the circumstances present in this case we find that plaintiff has sufficiently pleaded her claim. Plaintiff described incidents of inadequate rubbing or touching, comments about her legs and physical appearance which in the context described by plaintiff may be perceived as sexually charged as well as the way FERRER looked at her which she portrayed as lascivious. It is important to note that FERRER was plaintiff's

immediate supervisor and that apart from their periodic meetings they were in constant daily contact with each other via telephone or beeper.

Accordingly, we find that the evidence on record is sufficient for a reasonable fact finder to rule that plaintiff was subjected to a hostile work environment actionable under Title VII.

### C. Affirmative Defense

The employer's liability in this type of litigation will vary depending on whether the alleged harassor is the victim's co-worker or supervisor.

If a co-worker, an employer will be held accountable "if it 'knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action.'" White v. New Hampshire Dep't of Corrections, 221 F.3d 254, 261 (1st Cir. 2000) (citing Blankenship v. Parke Care Ctrs., Inc., 123 F.3d 868, 872 (6th Cir. 19997). *See also*, Noviello, 398 F.3d at 95.

In situations where a supervisor is charged with the inappropriate conduct his employer may defend to harassment claims provided no tangible employment action has been taken. "No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." Burlington Indus. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); Lee-Crespo, 354 F.3d at 43.

If the offender is a supervisor and no tangible employment action has been taken the employer carries the burden of establishing the following facts as an affirmative defense to the claims: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Burlington Indus. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633; Noviello, 398 F.3d at 94-95; Lee-Crespo, 354 F.3d at 46 n.8.

Plaintiff does not allege that she was subjected to an adverse personnel action as part of the hostile environment claim based on her supervisor's conduct. Rather, these allegations appear as part of her retaliation claim. Hence, WYETH-PR is entitled to raise the Ellerth and Faragher defense to the sexual harassment claim provided that it initially establishes that it took the necessary measures to prevent the harassment and to promptly address any such conduct. Additionally, the employer must also prove that plaintiff did not utilize the means at her disposal to either prevent or correct the situation.

Plaintiff has not put at issue her employer's efforts to avoid work place harassment. There is no controversy over the fact that WYETH-PR had in place an anti-harassment policy which was distributed to all employees - including plaintiff and the individual defendants

- and that the supervisors were given periodic trainings in this area. Further, the policy established alternative methods for employees to lodge harassment complaints against supervisors including verbal grievances to the Human Resources Director, in this case, PILAR SASTRE.

The parties differ, however, on their views regarding whether or not plaintiff gave WYETH-PR adequate notice of her sexual harassment claim and the adequacy of defendant's response to plaintiff's grievance in September 1999.

### (1) Notice and Corrective Measures - 1999

It is essential that the defendant be put on notice of the hostile environment situation in order to be able to take corrective action. Crowley v. L.L. Bean, Inc., 303 F.3d 387, 403 (1st Cir. 2002). Plaintiff "adequately alert[] her employer to the harassment". Cerros v. Steel Techs., Inc., 398 F.3d 944, 952 (7th Cir. 2005).

According to defendant, in September 1999 plaintiff failed to describe with specificity any incidents of a sexual nature.[18]

---

[18]  Defendant concedes that the following matters - subsequently included in the September 2000 letter - were addressed by plaintiff at the September 1999 meeting: (1) FERRER corrected plaintiff's silverware at the Cerromar Hotel; (2) FERRER asked plaintiff if she had an intimate relationship with CABRERA; (3) FERRER was not helping plaintiff with her expense reports and Company credit card problems; (4) FERRER told plaintiff the doctors she visited were not paying attention to her promotion because they were looking at her legs; (5) FERRER had not timely provided plaintiff with manuals needed for a POA in Santo Domingo; (6) FERRER was not courteous when he called plaintiff's home; (7) FERRER would tell plaintiff she was not paying attention at meetings and would ask her to repeat what was being

CIVIL NO. 01-2126 (RLA)                                    Page 25

It is undisputed that plaintiff initially approached PILAR SASTRE on September 27, 1999 but did not submit any written complaint until a year later in September 2000. At first, plaintiff and PILAR SASTRE met alone. However, at some point after having listened to plaintiff's account SASTRE called LOPEZ into her office to also participate in the meeting.

As previously noted, plaintiff has given a different version of what transpired at the September 1999 meeting initially with PILAR SASTRE and subsequently with LOPEZ. According to plaintiff at that time she specifically alerted both SASTRE and LOPEZ of repeated incidents of sexually charged conduct.

It appearing that there are contradictory versions as to the extent of plaintiff's complaints during her conversations with both SASTRE and LOPEZ in September 1999 it is for a jury to decide which account it will choose to believe.

WYETH-PR argues that despite plaintiff's failure to adequately provide notice of the harassment after the initial meeting in September 1999 it took the appropriate measures to deal with the situation. According to LOPEZ he conferred with FERRER and concluded that there was no sexual harassment involved but rather a clash of personalities. A meeting was then held between LOPEZ, FERRER and

_____

said, and (8) FERRER had asked TOMAS VAZQUEZ, a co-worker if he had a relationship with plaintiff.  WYETH-PR's Memorandum of Law (docket No. 126) p. 20.

plaintiff where FERRER apologized for any discomfort and agreed to help her with her expense reports and credit card problems.

Plaintiff, on the other hand, questions the adequacy of this meeting with LOPEZ and FERRER in September 1999 arguing that nothing changed but rather that the harassment continued.

Employers have a duty both to respond to hostile environment situations and to correct them. Further, in order to be entitled to the... ... defense the response "'must be reasonably calculated to *prevent further harassment* under the particular facts and circumstances of the case at the time the allegations are made.'" Cerros, 398 F.3d at 953 (citing McKenzie v. Ill. Dep't of Transp., 92 F.3d 473, 480 (7th Cir. 1996)) (italics in original). In other words, defendant must take "'prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring.'" Cerros, 398 F.3d at 954 (citing Williams v. Waste Mgmt. of Ill., Inc., 361 F.3d 1021, 1029 (7th Cir. 2004)); Tatum v. Ark. Dep't of Health, 411 F.3d 955 (8th Cir. 2005); Wilson v. City of Des Moines, 338 F.Supp.2d 1008 (S.D. Iowa 2004); Speaks v. City of Lakeland, 315 F.Supp.2d 1217 (M.D. Fla. 2004); Lewis v. Forest Pharm., Inc., 217 F.Supp.2d 638 (D. Md. 2002).

We find that the adequacy of the remedial measures taken by defendant in September 1999 are in controversy. Assuming plaintiff's version of the events as true, defendant's response was limited to LOPEZ interviewing FERRER followed by a "coaching" type session

presided by LOPEZ, a long time personal friend with FERRER.[19] No specific measures were taken regarding harassment; no corrective action was taken.

## (2) Notice and Corrective Measures - 2000

In September 2000 plaintiff sent a letter to WYETH-PR complaining of a series of incidents[20] which prompted a meeting with plaintiff, SASTRE, CABRERA and CURET on September 19, 2000 to discuss plaintiff's allegations. According to WYETH-PR, once again plaintiff did not go beyond general allegations for which reason the Company concluded that her claims did not rise to the level of sexual harassment. Nonetheless, it was decided that it would be best if plaintiff's immediate supervisor was immediately changed. Thus, as a temporary measure, until December 31, 2000, plaintiff would report to LUIS RIVERA, of District II while continuing to work in District I .

Plaintiff agreed to this decision and readily concedes the harassment stopped in September 2000. Hence, the adequacy of WYETH-PR's response to plaintiff's complaint at that time is not at issue.

---

[19]   According to plaintiff LOPEZ, FERRER and CURET were very close personal friends since 1994 and would play golf and basketball together.

[20]   The items listed in this correspondence appear listed at note 18 *ante*.

CIVIL NO. 01-2126 (RLA)                                    **Page 28**

---

### RETALIATION

In addition to her hostile environment claim plaintiff alleges that she was subjected to retaliation as a result of her September 1999 verbal complaint and September 2000 letter to WYETH-PR.

### A. Timeliness

The first challenged retaliatory event is a change in plaintiff's portfolio from PHC 3 products to PHC 2 which took place in January 2000 and which defendant challenges as untimely.

Hostile environment claims involve repeated conduct which extends over a period of time and "therefore cannot be said to occur on any particular day" in contrast to discrete discriminatory acts. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115, 122 S.Ct. 2061, 2073, 153 L.Ed.2d 106, 123 (2002). *See also,* Lee-Crespo, 354 F.3d at 44 (difference between "[e]xplicit alterations – that is, tangible employment actions" and a sequence of events that are so severe or pervasive that alter the conditions of employment and which collectively are deemed a single wrongful practice.); *See also*, Goya, 304 F.3d at 18 (distinction between "hostile work environment claims and claims involving discrete acts of discrimination or retaliation, such as a discharge, failure to promote, denial of transfer, or refusal to rehire.")

For purposes of the limitations period we must distinguish between discrete discriminatory and retaliatory practices such as terminations, failure to promote, and transfers each of which is

independently actionable from hostile work environment claims which are typically comprised of a series of events which take place over a period of time. Hence, claims based on discrete discriminatory acts will accrue at the time of the unlawful conduct whereas in hostile work environment claims "the statute of limitations 'will not exclude acts that are part of the same unlawful employment practice if at least one act falls within the time period.'" Ruiz-Susona v. Univ. of Puerto Rico,  334 F.3d 157, 160 (1st Cir. 2003) (citing Dressler v. Daniel, 315 F.3d 75, 79 (1st Cir. 2003)).

For limitations purposes an initial harassment and subsequent retaliation are ordinarily "two separate and independent harms" and "not sufficiently related" to be considered "a single continuing violation." Noviello, 398 F.3d at 87. This is because according to Noviello in most cases there is a "disparity" of the underlying motives behind sexual harassment and retaliation provoked by complaints of such conduct.

> Most often, retaliation is a distinct and independent act of discrimination, motivated by a discrete intention to punish a person who has rocked the boat by complaining about an unlawful employment practice. That is a different animus than the sexual animus that drove the original harassment.

Noviello, 398 F.3d at 87 (citations omitted).

Plaintiff's change of portfolio on January 28, 2000 constitutes a specific employment decision with purportedly adverse consequences and therefore, actionable if based on unlawful motives. Accordingly, pursuant to 42 U.S.C. § 2000e-5(e)(1), plaintiff was required to submit her EEOC complaint by November 2000, that is, within 300 days from the retaliatory event. Noviello, 398 F.3d at 85. It is uncontested that this particular claim was not included in plaintiff's EEOC complaints either in September or November 2000.

Based on the foregoing, plaintiff's retaliation claim premised on the January 2000 change in portfolio is **DISMISSED AS TIME-BARRED.**

### B. Cause of Action

Title VII proscribes retaliation by an employer based on an employee's complaint of discriminatory practices. 42 U.S.C. § 2000e(3)(a). A prima facie retaliation showing requires that plaintiff present evidence that: (1) she engaged in Title VII protected conduct; (2) experienced an adverse employment action; and (3) there is a causal connection between the protected conduct and the ensuing adverse action. Noviello, 398 F.3d at 88; Che, 342 F.3d at 38; Dressler v. Daniel, 315 F.3d at 78; Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002); Marrero v. Goya, 304 F.3d at 22. "Once the plaintiff has made a prima facie showing of retaliation, the *McDonnell Douglas* burden-shifting approach is employed, and defendant must articulate a legitimate, non-retaliatory reason for its employment decision. If the defendant meets this burden, the

plaintiff must now show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 26 (1st Cir. 2004); Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003); Che, 342 F.3d at 39. Should the employer advance a legitimate reason for its decision, "the ultimate burden falls on the plaintiff to show that the employer's proffered reason is pretext masking retaliation...." Mesnick, 950 F.2d 816, 827 (1st Cir. 1991).

However, in the context of a summary judgment "'the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a question for a factfinder as to pretext and discriminatory animus.'"   Calero-Cerezo, 355 F.3d at 26 (citing Fennell v. First Step Designs, Ltd., 83 F.3d 526,  535 (1st Cir. 1996)).

In order for plaintiff to succeed in her retaliation claim she must prove that she was the object of an adverse employment action. "To be adverse, an action must materially change the conditions of plaintiffs' employ." Gu, 312 F.3d at 14. "Section 20003-3 encompasses a variety of adverse employment actions, including demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by

other employees." Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998).  *See also*, Gu, 312 F.3d at 14; and Goya, 304 F.3d at 23.

Just because an employee is dissatisfied with his or her employer's business decisions is not enough to meet the statute's "adverse" action requirement. "'Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate the act or omission to the level of a materially adverse employment action.'" Goya, 304 F.3d at 23 (citing Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996)). Changes in duties or working conditions that cause no materially significant disadvantage do not establish an adverse employment action. Stated otherwise, a transfer involving "only minor changes in working conditions" will not violate Title VII. Goya, 304 F.3d at 23. "Not every minor advantage or status symbol is protected by the statute." Melendez-Arroyo v. Cutler-Hammer de P.R. Co., Inc., 273 F.3d 30, 36 (1st Cir. 2001).

Both disadvantageous transfers as well as refusals to transfer may trigger Title VII liability. Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997). The court will examine "the less tangible aspects of the transfer" to objectively determine if these qualify as an "adverse" action. Goya, 304 F.3d at 24. "Whether an employment action is 'adverse' - and therefore actionable under Title VII - is gauged by an objective standard" *Id.* at 23. Title VII protection extends

beyond "'strictly monetary considerations'"  Goya, 304 F.3d at 23 (citing Collins v. Illinois, 830 F.2d 692, 703 (7th Cir. 1987)) and hence, the notion "that a transfer cannot qualify as an 'adverse employment action' unless it results in a diminution in salary or loss of benefits" has been rejected.  Goya, 304 F.3d at 24. *See, i.e.*, Melendez-Arroyo, 273 F.3d at 36 (up to the jury to determine if plaintiff had been the victim of a significant adverse job action in case of transfer with small pay increase where plaintiff was moved from position of substantial responsibility over a number of employees, initially given no tasks and after several months only assigned menial ones).

Defendant concedes that plaintiff engaged in conduct protected by Title VII but disputes that plaintiff suffered an adverse employment action as a result thereof.

The Supreme Court has defined a tangible adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits."  Burlington Indus.v. Ellerth, 524 U.S. at 749, 118 S.Ct. 2257, 141 L.Ed.2d 633; Lee-Crespo, 354 F.3d at 43.

A reassignment may be considered a tangible employment action "particularly if it caused a loss of income [] [b]ut again, there must be a causal link between the tangible employment action and the alleged harassment and harasser." Lee-Crespo, 354 F.3d at 44.

CIVIL NO. 01-2126 (RLA)                                          Page 34

---

### (1) Change in District and Product

Plaintiff claims that her reassignment to a different district and product line in January 2001 "adversely affected the terms and conditions of her employment."[21] According to her this constituted an undesirable transfer because it entailed covering a different geographical area and different physicians from the ones she had grown accustomed to in her previous district and would therefore affect her performance.

However, pursuant to plaintiff's job description, as a medical representative she was responsible for promoting and selling WYETH pharmaceutical products and was not hired to promote a specific product portfolio in a particular location. Plaintiff argues that the change resulted in lower commissions. However, commissions are based on multiple factors including market share growth which in turn depends on the combined efforts of the medical representatives assigned to that specific product in each particular territory.

We find that defendant has proffered sufficient non-discriminatory reasons for plaintiff's reassignment in January 2001 which plaintiff has failed to rebut. It was clear that the supervisory arrangement effective September 2000 was temporary and was meant to conclude in December 2000. Leaving plaintiff in Territory I while supervised by FERRER would not be an acceptable

---

[21] Plaintiff's Opposition to Motion for Summary Judgment (docket No. 128) p. 46.

CIVIL NO. 01-2126 (RLA)                                        **Page 35**

option. On the other hand, having her remain in FERRER's district while being supervised by LUIS RIVERA, from another territory did not allow for an efficient working relationship given WYETH-PR's organizational scheme. Each district manager was responsible for the marketing growth of the products within his specific geographical area which in turn entailed tracking down the sales of each representative assigned to the district. Hence, plaintiff's performance in District I had no bearing on the productivity of RIVERA's district. Additionally, when she received her performance evaluation in January 8, 2000 plaintiff indicated that was happy with RIVERA's supervision during the past three months.

Further, when transferred to District II plaintiff was taken off the PHC 2 portfolio and again assigned to the PHC 3 portfolio which she had previously worked on since 1995.[22]

### (2) Expenses

Plaintiff further claims that defendant refused to reimburse her expenses in retaliation for her complaints which caused her to fall behind her corporate credit card payments. However, this situation dates back to her original 1999 meeting with PILAR SASTRE and therefore, cannot be causally linked to her protected conduct.

---

[22] As already noted at page 28 *ante*, plaintiff challenged the previous 9 month designation to the PHC 2 portfolio as retaliatory.

### (3) Promotion to Hospital Division

Plaintiff further argues that WYETH-PR's refusal to promote her to its hospital division was also retaliatory. However, plaintiff only makes reference to a July 31, 2000 denial of her application which would be time-barred inasmuch as no EEOC claim has been submitted addressing this event.

Further, "[t]o survive summary judgment and establish a prima facie case in a failure to hire case, plaintiffs must produce evidence on four points: (1) they are members of a protected class; (2) they applied for an open position; (3) they were not selected; and (4) their employer filled the position by hiring another individual with similar qualifications." Gu, 312 F.3d at 11.

No evidence has been presented to establish that plaintiff was qualified and applied for an available position and was not selected in favor of equally or less qualified employees who had not participated in a protected activity.

### TITLE VII - INDIVIDUAL LIABILITY

The individual defendants have petitioned the court to dismiss the Title VII discrimination claims asserted against them personally and to decline jurisdiction over the supplemental claims.

Even though the issue has not been addressed by the U.S. Supreme Court or the First Circuit Court of Appeals, we find that there can be no liability of a co-worker under Title VII since the scope of the statute is limited to employers of the alleged victim of

**CIVIL NO. 01-2126 (RLA)**                                          **Page 37**

discrimination. *See*, <u>Torres Ramos v. Metro Guard Serv. Inc.</u>, ___
F.Supp.2d ___, 2005 WL 1639438 (D.P.R. July 12, 2005) and cases cited
therein. *See also*, <u>Olivo-González v. Teacher's Retirement Bd.</u>, 208
F.Supp.2d 163, 166 (D.P.R. 2002); <u>Matos v. Ortiz v. Com. of Puerto
Rico</u>, 103 F.Supp.2d 59, 61 (D.P.R. 2000); <u>Maldonado-Cordero v. AT&T</u>,
73 F.Supp.2d 177, 184 (D.P.R. 1999); <u>Canabal v. Aramark Corp.</u>, 48
F.Supp.2d 94, 96 (D.P.R. 1999); <u>Santiago v. Floyd</u>, 33 F.Supp.2d 99,
102 (D.P.R. 1998).

Accordingly, the Title VII claims asserted against FERRER, LOPEZ
and CURET in their personal capacity are hereby **DISMISSED**.

**SUPPLEMENTAL JURISDICTION**

It appearing that there is still pending a hostile environment
claim against WYETH-PR under Title VII the Court, in its discretion,
may entertain the state-based claims asserted against the individual
defendants under its supplemental jurisdiction pursuant to 28 U.S.C.
§ 1367(a).

Thus, the petition to dismiss the supplemental claims filed by
FERRER, LOPEZ and CURET is **DENIED.**

**CONCLUSION**

Based on the foregoing, WYETH-PR's Motion for Summary Judgment
(docket No. **126**)[23] is disposed of as follows:

---

[23]   *See also*, Motion Submitting Certified Translations (docket
No. **125**); Plaintiff's Opposition (docket No. **128**); Plaintiff's
Statement of Contested Material Facts (docket No. **129**); Informative
Motion (docket No. **130**); Reply (docket No. **132**); Plaintiff's Sur-

CIVIL NO. 01-2126 (RLA)                                              **Page 38**

—    The request to dismiss plaintiff's hostile environment claims due to sexual harassment is **DENIED.**

—    Plaintiff's retaliation claims are **DISMISSED.** Judgment shall be entered accordingly.

The Individual Defendants' Motion for Summary Judgment (docket No. **120**)[24] is hereby disposed of  as follows:

—    The Title VII claims asserted against FERRER, LOPEZ and CURET in their personal capacity are hereby **DISMISSED.** Judgment shall be entered accordingly.

—    The petition to dismiss the supplemental claims is **DENIED.**

IT IS SO ORDERED.

San Juan, Puerto Rico, this 18th day of August, 2005.

                                        S/Raymond L. Acosta
                                        RAYMOND L. ACOSTA
                                      United States District Judge

---

Reply Memorandum (docket No. **133**); Plaintiff's Surreply Statement (docket No. **134**); Plaintiff's Motion Submitting Index of Exhibits (docket No. **140**). WYETH-PR's Informative Motion (docket No. **127**) is **NOTED.** Plaintiff's Request for Leave to File Exhibits in Spanish (docket No. **131**) is **GRANTED.**

[24]    *See also*, Motion Enclosing Exhibit (docket No. **121**); Motion Submitting Certified English Translation (docket No. **124**); Plaintiff's Opposition (docket No. **135**); Plaintiff's Statement of Contested Material Facts (docket No. **136**); Comparison and Analysis of Individual Defendants' Statement of Uncontroverted Facts (docket No. **141**), and Plaintiff's Sur-Reply (docket No. **144**).